COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                        NO.
2-05-093-CV

 

 

IN THE INTEREST OF H.H. AND R.H.,
CHILDREN                                       

                                                    

 

                                              ------------

 

           FROM
THE 97TH DISTRICT COURT OF MONTAGUE COUNTY

 

                                              ------------

 

                                MEMORANDUM
OPINION[1]

 

                                              ------------

I. Introduction








Appellant Robert H. appeals
the trial court=s order
terminating his parental rights to his children, H.H. and R.H.  In two issues, Robert argues that the
evidence is legally and factually insufficient: (1) to support termination of
his parental rights under any of the grounds found by the jury and (2) to
support the jury=s finding
that termination of his parental rights is in the best interest of H.H. and
R.H.[2]  We affirm.

II. Factual and Procedural
Background

Robert and Amy began their
relationship in 1993 and married a few years later, while Robert was
incarcerated in Denton County Jail.  Amy
has three other children besides H.H. and R.H.: 
J.L., J.V., and T.V.  Amy gave
custody of her oldest son, J.L., to her father when J.L. was eight months
old.  J.L. now lives in Memphis,
Tennessee with a non-relative.  Amy has
not seen him since he was two years old. 
J.V. and T.V. live with Amy=s mother in Saint Jo, Texas. 
J.V. is seventeen and on probation for sexually assaulting H.H. and
R.H.  








In October 2003, the Texas
Department of Protective and Regulatory Services[3]
(the Department) received a referral alleging that Amy=s live-in boyfriend, Randy Bryce, had sexually abused H.H.  At the time the Department received the
referral, H.H. and R.H. were living at the home of their maternal grandmother,
Kathryn LaComb.  When the Department sent
an agent to LaComb=s home to
investigate, the agent discovered that Amy had not been home with the children
for a few days.  

The Department had received
other referrals regarding H.H. and R.H. in the past.  Specifically, one referral in April 2003
alleged that J.V. had sexually assaulted R.H. and H.H. while under the
supervision of H.H.=s paternal
grandmother, Bobbie Caldwell.  Additional
referrals alleged that Robert had abused H.H.; that LaComb had physically
abused J.V., H.H., and R.H; and that Caldwell had failed to properly supervise
H.H. and R.H. 

On October 13, 2003, the
trial court allowed the Department to remove the children from LaComb=s home, placed them in foster care, and set a hearing regarding
conservatorship and termination of the parent-child relationship.  At the time of the children=s removal, Robert was incarcerated in the Denton County Jail for
burglary.  

H.H. and R.H. were still in
foster care at the time of the trial. 
H.H. was ten years old, and R.H. was nine years old.  After a four-day trial, the jury found that
Robert had

1.     knowingly placed or knowingly allowed the children to remain in
conditions or surroundings which endanger the physical or emotional well-being
of the children;

 

2.     engaged in conduct or knowingly placed the children with persons
who engaged in conduct which endangers the physical or emotional well-being of
the children;








3.     constructively
abandoned the children; and

 

4.     failed
to comply with the provisions of a court order that specifically established
the actions necessary for the father to obtain the return of the children.[4]


 

The jury also found that termination of Robert=s parental rights would be in the children=s best interest.[5]  The trial court rendered judgment on the jury=s verdict, and this appeal followed.

III. Standards of Review








A parent=s rights to A>the companionship, care, custody, and management=@ of his children are constitutional interests Afar more precious than any property right.@[6]  In a termination case, the
State seeks not just to limit parental rights but to end them permanentlyCto divest the parent and child of all legal rights, privileges,
duties, and powers normally existing between them, except for the child=s right to inherit.[7]  Nonetheless, while parental rights are of
constitutional magnitude, they are not absolute.[8]  Just as it is imperative for courts to
recognize the constitutional underpinnings of the parent-child relationship, it
is also essential that emotional and physical interests of the child not be
sacrificed merely to preserve that right.[9]

In proceedings to terminate
the parent‑child relationship brought under section 161.001 of the family
code, the petitioner must establish one or more of the acts or omissions
enumerated under subdivision (1) of the statute and must also prove that
termination is in the best interest of the child.[10]   Both elements must be established;
termination may not be based solely on the best interest of the child as
determined by the trier of fact.[11]  Because of the elevated status of parental
rights, the quantum of proof required in a termination proceeding is elevated
from the preponderance of the evidence to clear and convincing evidence.[12]








Clear and convincing evidence
is Athe measure or degree of proof that will produce in the mind of the
trier of fact a firm belief or conviction as to the truth of the allegations
sought to be established.@[13]  This intermediate standard
falls between the preponderance standard of ordinary civil proceedings and the
reasonable doubt standard of criminal proceedings.[14]  While the proof must be more than merely the
greater weight of the credible evidence, there is no requirement that the
evidence be unequivocal or undisputed.[15]  Termination proceedings should be strictly
scrutinized, and involuntary termination statutes are strictly construed in
favor of the parent.[16]


IV. Evidence Regarding
Endangering Conduct








Robert asserts in his first
and second issues that the evidence is legally and factually insufficient to
support the jury=s finding
that he engaged in conduct that endangered the physical or emotional well-being
of H.H. and R.H. He argues that evidence of his criminal behavior from the
1980s is too remote to support a finding on the endangering ground.  Robert also contends that evidence of more
than a single act or omission is required to justify termination of parental
rights under section 161.001 and that no course of endangering conduct was
proven to exist during the Department=s involvement.

Under section 161.001(1)(E),
the relevant inquiry is whether evidence exists that the endangerment of the
child's physical well‑being was the direct result of the parent's
conduct, including acts, omissions, or failures to act.[17]
Endangerment under this section must be based on more than a single act or
omission; a voluntary, deliberate, and conscious course of conduct by the
parent is required.[18]  It is not necessary, however, that the
parent's conduct be directed at the child or that the child actually suffer
injury.[19]  

To determine whether
termination is necessary, courts look to parental conduct both before and after
the child's birth.[20]  A parent=s past endangering conduct may create an inference that the parent=s past conduct may recur and further jeopardize a child=s present or future physical or emotional well-being.[21]









Drug addiction and its effect
on a parent's life and ability to parent may establish an endangering course of
conduct.[22]  A parent=s decision to engage in illegal drug use during the pendency of a
termination suit, when the parent was at risk of losing a child, supports a
finding that the parent engaged in conduct that endangered the child=s physical or emotional well-being.[23]


Evidence of criminal conduct,
convictions, and imprisonment prior to the birth of a child will support a
finding that a parent engaged in a course of conduct that endangered the child=s well-being.[24]  While imprisonment alone does not constitute
a continuing course of conduct that endangers the physical or emotional
well-being of a child, however, it is a fact properly considered on the issue
of endangerment.[25]  

The record contains the
following evidence of Robert=s endangering conduct:








During trial, Robert stated, AI am an addict.  I am always
going to be an addict.@  Robert began using methamphetamine and
cocaine in 1993, when he was thirty-five. 
He admitted that he used to shoot up methamphetamine, that he and Amy
used drugs together throughout their marriage, that he and Amy used drugs while
the children were in their home, and that he has been under the influence of
drugs while he was around H.H. and R.H. 
Robert further testified that H.H. walked in on him in the bathroom Aas I was fixing to shoot a needle, but she did not see nothing.@ 

Robert said that he last used
marijuana and cocaine in May 2004, after the children were in foster care and
while he was on parole.  He admitted he
had been ordered by his service plan and by the trial court not to use any
illegal substances.  He further admitted
at trial that he lied to the Department about his cocaine use in January or
February 2004.  Robert stated that he
relapsed into drug use in May 2004 and had a Adirty UA@ for
marijuana and cocaine.  He said that he
used drugs at that time because he Ajust wanted to get high@ and not because his need to get high was so overpowering that he
could not control it.  He admitted he
wanted to get high even knowing there was a risk involving his children and his
parole.  








The record shows that Robert
has an extensive criminal history beginning in 1975 and continuing until
November 15, 2004.  He has been
incarcerated for the majority of his children=s lives.  His criminal
background includes at least five convictions for burglary, convictions for
escape and evading arrest, and five parole revocations.  He is still on parole for a 1982 conviction
for burglary of a building because his parole on this sentence has been revoked
three or four separate times for parole violations and the commission of new
offenses. Robert also stated that he had been incarcerated for evading arrest
prior to his escape from jail in 1997.  

At the time of trial, Robert
was in the Denton County Jail on a parole violation for possession of stolen
property and on a charge of burglary of a building, which was committed on
November 15, 2004.  He admitted that he
suspected the materials were stolen, that he knew receiving stolen property is
a felony, and that he knew he could get his parole revoked and go back to
prison for possession of stolen property and burglary of a building.  When counsel asked him why he would risk
getting locked up again for buying the stolen property, Robert responded, ATruthfully, I didn=t think I was going to get caught.@  When discussing his
incarceration and its effects on his children, he stated, AI=m at fault
because I was locked up. I wasn=t there for my kids for what happened to them.@  He further admitted, AIt has hurt him [R.H.] over the years with me being locked up.@








The record also shows that
Robert has a cavalier attitude about his criminal history and has even
encouraged criminal behavior in his children. 
At trial he confessed, AThree convictions in the penitentiary is not to me a major thing.@  In a letter to Amy after he
completed a parenting class, he wrote, A[H.H.] got caught sneaking and calling me on the foster mom=s cell phone, so I got a cell phone turned on for her to call me. She
keeps it hid.  Think she isn=t smart?  A baby crook.  She has got good blood.@

We hold that the evidence is
both legally and factually sufficient to support a jury=s finding of endangerment under section 161.001(1)(E).[26]

V. Evidence Regarding Best
Interest

Nonexclusive factors that the
trier of fact in a termination case may use in determining the best interest of
the child include:

(1)    the desires of the child;

 

(2)    the emotional and physical needs of the child now and in the
future; 

 

(3)    the emotional and physical danger to the child now and in the
future; 








(4)    the parental abilities of the individuals seeking custody; 

 

(5)    the programs available to assist these individuals to promote the
best interest of the child;

 

(6)    the plans for the child by these individuals or by the agency
seeking custody;

 

(7)    the stability of the home or proposed placement;

 

(8)    the acts or omissions of the parent which may indicate that the
existing parent‑child relationship is not a proper one; and

 

(9)    any excuse for the acts or omissions of the parent.[27]

 

These factors are not
exhaustive; some listed factors may be inapplicable to some cases; other
factors not on the list may also be considered when appropriate.[28]  Furthermore, undisputed evidence of just one
factor may be sufficient in a particular case to support a finding that
termination is in the best interest of the children.[29]  On the other hand, the presence of scant
evidence relevant to each Holley factor will not support such a finding.[30]  

We now address the Holley
factors for which relevant evidence was admitted. 








A. Desires of the Children

Carol Morath, the children=s guardian ad litem, testified that neither H.H. nor R.H. wanted to be
with Robert.  The children told Morath
that Robert was mean, and one or both of them told her they thought he was
still in jail. 

B. The Emotional and Physical
Needs of the Children Now and in the Future

Darlene Hall, a caseworker
with the Department, testified that H.H. has an anger management problem and Astrikes out@ when she
does not get her way.  H.H. has been
moved from foster placements because of her bad behavior.  H.H. has been in therapy to deal with her
issues and Hall testified that H.H. will need long-term therapy to deal with
emotional issues caused by her sexual abuse. 

R.H. is also in therapy.  R.H. suffers from encropesis, an inability to
control his bodily functions.  When R.H.
first came into the Department=s care, he was unable to control his bodily functions up to four or
five times a day. R.H.=s condition
is improving, but Hall testified that R.H. will need long-term therapy.

C. Emotional and Physical
Danger to the Children Now and in the Future








Robert has been incarcerated
for the majority of his children=s lives and has an extensive history of drug abuse.  The record also reveals that Robert has had a
history of domestic violence and physically abused Amy and other members of his
family.  Robert admitted that H.H. had
seen him hit Amy at least twice.  Robert
also admitted that Amy was in an Aabusive@
relationship with him, that he blackened both of her eyes once, and that he
slapped her open handed and with a closed fist. 
Robert further admitted that a pattern of physical violence and drug use
existed throughout his marriage to Amy and that the drug use caused the
fights.  Amy testified that Robert had
been physically abusive toward R.H., his mother, his brothers, and Amy=s brothers.  Amy stated that
these physical altercations happened when Robert, Amy, H.H., and R.H. lived
with Caldwell. 

D. Parental Abilities of the
Individual Seeking Custody








Robert=s parental abilities are virtually non-existent.  Although he did present evidence of having
completed some parenting classes, he has not shown an ability to meet the
physical and emotional needs of his children. Because of his repeated criminal
conduct and parole violations, Robert has been in prison or jail for all but
three or four years of his children=s lifetimes.  And, for the
periods that Robert was out of jail, he was frequently under the influence of
drugs, and H.H. and R.H. witnessed his violent behavior with their mother.  In discussing his incarceration and its
effects on his children, Robert admitted, AI=m at fault
because I was locked up.  I wasn=t there for my kids for what happened to them.@  Robert admitted that he had a Along ways to go@ before he
would be ready to have the children placed with him. 

Further, as a result of
Robert=s repeated absences from his children=s lives, Robert has failed to meet his parental responsibilities in
the past by allowing others to assume the custody and care of his
children.  H.H. and R.H. lived with
Caldwell, Robert=s mother,
during many of the times either Robert or Amy, or both of them, were
incarcerated.  Caldwell had previously
been convicted of selling drugs.  A
number of convicted felons Awandered in and out@ of Caldwell=s house
while the children were there.  Also,
when R.H. told his therapist that J.V. had molested him and H.H., the children
were living in Caldwell=s home.  Caldwell was aware of the sexual abuse, but
she did not contact the Department because she feared the children would be
removed from her home.  

E. Plans for the Children by
the Individual Seeking Custody

Hall testified that the
Department planned for H.H. and R.H. to be adopted together and that they were
adoptable.  At the time of trial, Robert
was in jail and faced a possible parole revocation and criminal conviction.
Robert wanted H.H. and R.H. placed with Caldwell until he was released from
jail or prison, and then he planned to move with the children to Arizona and to
work driving a wrecker.








F. Acts or Omissions of the
Parent

 When Robert met with Hall to discuss the
service plan and with hopes of eventually reuniting with his children, Hall
stated that Robert seemed to be anxious to start working his plan and to see
his children.  Although Robert told Hall
that he set up counseling, parenting, and drug addiction classes in an effort
to comply with his service plan, Hall stated that she later discovered that
Robert had lied about attending the classes. 
During that same time, Robert called Hall to cancel one of his
visitation sessions with his children because it conflicted with one of the
counseling sessions Hall believed he was attending. After Hall confronted
Robert about misleading her, Robert admitted to Hall that he had lied and that
he knew he had Ascrewed up.@  Robert then promised Hall he
would improve.  

Although Hall continued to
work with Robert after he had lied to her, she testified that Robert=s attitude towards her changed. 
Hall testified that it was the first time she felt he could become
hostile or aggressive with her.  Robert
then started making fewer contacts with Hall, started coming to fewer visits,
and eventually stopped showing up for visits and for court hearings.  By July 2004, Hall testified that the
Department=s plan for
reunification had changed to a concurrent plan to continue to reunify but to
terminate parental rights if reunification did not work.  








Hall then testified that
Robert requested a home visit from her on September 15, 2004.  But when Hall arrived at Caldwell=s house, where Robert lived, Robert was not there.  Hall did not see Robert, nor did she receive
documentation concerning his whereabouts between September 2004 and the
termination trial in February 2005. 
Robert underwent surgery in September 2004.  Hall received one phone call from him in
October 2004, during which he mentioned having transportation problems.  Hall offered to help Robert find
transportation, but Robert told her that he did not need her help.

We hold that the evidence is
legally and factually sufficient to sustain the jury=s finding that termination of Robert=s parental rights to R.H. and H.H. is in the children=s best interest.[31]  Accordingly, we overrule Robert=s issues.  

VI. Conclusion

Having overruled each of
Robert=s issues on appeal, we affirm the trial court=s judgment.  

 

PER CURIAM

PANEL A:   CAYCE,
C.J.; HOLMAN and MCCOY, JJ.

DELIVERED: 
January 26, 2006








 











[1]See Tex. R. App. P. 47.4.





[2]Amy
H., H.H. and R.H.=s
mother and Robert H.=s
wife, was a party below but did not appeal the trial court=s
termination order.





[3]This
agency is now known as the Department of Family and Protective Services. Tex. Fam. Code Ann. '
261.001(2) (Vernon Supp. 2005). 





[4]See Tex. Fam. Code Ann. ' 161.001(D),
(E), (N), (O). 





[5]See
id. '
161.001(2).





[6]Santosky
v. Kramer, 455 U.S. 745, 758-59, 102 S. Ct. 1388, 1397
(1982); In re M.S., 115 S.W.3d 534, 547 (Tex. 2003). 





[7]TEX. FAM. CODE ANN. '
161.206(b); Holick v. Smith, 685 S.W.2d 18, 20 (Tex. 1985). 





[8]In re C.H., 89 S.W.3d 17, 26 (Tex. 2002).





[9]Id. 





[10]TEX. FAM. CODE ANN. '
161.001; In re J.L., 163 S.W.3d 79, 84 (Tex. 2005). 





[11]Tex.
Dep=t of
Human Servs. v. Boyd, 727 S.W.2d 531, 533 (Tex. 1987).





[12]Santosky, 455
U.S. at 746, 102 S. Ct. at 1391; see also Tex. Fam. Code Ann. ' 161.001.  





[13]Tex. Fam. Code Ann. '
101.007 (Vernon 2002).





[14]In re
G.M., 596 S.W.2d 846, 847 (Tex. 1980); In re K.W., 138 S.W.3d 420,
425 (Tex. App.CFort
Worth 2004, pet. denied). 





[15]State
v. Addington, 588 S.W.2d 569, 570 (Tex. 1979); In re D.T.,
34 S.W.3d 625, 630 (Tex. App.CFort Worth 2001, pet. denied)
(op. on reh=g). 





[16]Holick, 685
S.W.2d at 20‑21; In re A.V., 849 S.W.2d 393, 400 (Tex. App.CFort
Worth 1993, no writ).





[17]In re
R.D., 955 S.W.2d 364, 368 (Tex. App.CSan Antonio 1997, pet.
denied); Dupree v. Tex. Dep't of Protective & Regulatory Servs., 907
S.W.2d 81, 83‑84 (Tex. App.CDallas 1995, no writ). 





[18]TEX. FAM. CODE ANN. '
161.001(1)(E);  D.T., 34 S.W.3d at
634; In re K.M.M., 993 S.W.2d 225, 228 (Tex. App.CEastland
1999, no pet.).





[19]Boyd, 727
S.W.2d at 533.   





[20]In re
D.M., 58 S.W.3d 801, 812 (Tex. App.CFort Worth 2001, no pet.)





[21]See
id.





[22]In re
R.W., 129 S.W.3d 732, 739 (Tex. App.CFort Worth 2004, pet.
denied); In re J.T.G., 121 S.W.3d 117, 125-26 (Tex. App.CFort
Worth 2003, no pet.); Dupree, 907 S.W.2d at 84. 





[23]In re
J.J.O., No. 2-03-00267-CV, 2004 WL 966317, at *4 (Tex. App.CFort
Worth May 6, 2004, no pet.) (mem. op.) 





[24]J.T.G., 121
S.W.3d at 133. 





[25]Boyd, 727
S.W.2d at 533; R.W., 129 S.W.3d at 743-44.   





[26]Where
multiple grounds for termination are alleged, only one predicate finding under
section 161.001(1) is necessary to support a judgment of termination.  A.V., 113 S.W.3d at 362.  Because we find that Robert engaged in
conduct that endangered the physical or emotional well-being of H.H. and R.H.
under section 161.001(1)(E), we need not address the remaining statutory
grounds for termination that were found by the jury.





[27]Holley
v. Adams, 544 S.W.2d 367, 371‑72 (Tex. 1976). 





[28]C.H., 89
S.W.3d at 27.





[29]Id.





[30]Id.





[31]See In re J.F.C., 96 S.W.3d 256, 264-68 (Tex. 2002)
(discussing legal sufficiency review); C.H., 89 S.W.3d at 25 (discussing
factual sufficiency review).